**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| EARLENE PETERSON | ) | |
| KIMMA GUREL | ) | |
| MONICA VIELLETTE | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:20-cv-00350-JMS-MJD |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM P. BARR, in his official | ) | |
| capacity as the Attorney General of the | ) | |
| United States; MICHAEL CARVAJAL, in | ) | |
| his official capacity as the Director of the | ) | |
| Federal Bureau of Prisons; and T.J. | ) | |
| WATSON, in his official capacity as | ) | |
| Complex Warden for Terre Haute Federal | ) | |
| Correctional Complex, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

I.      PROCEDURAL HISTORY.......................................................................................... 3

II.     BOP'S EXECUTION PREPARATIONS...................................................................... 5

STANDARD OF REVIEW ................................................................................................ 7

ARGUMENT .................................................................................................................... 8

I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED IN SHOWING THAT BOP'S PROMPT SCHEDULING OF MR. LEE'S EXECUTION VIOLATES THE APA.......... 8

      A.     The Decision as to When To Schedule An Execution Is Committed to Agency Discretion By Law...................................................................... 8

      B.     Plaintiffs Are Outside the Zone of Interests Protected By Any Applicable Law ....................................................................................... 11

      C.     The Attorney General's Decision to Promptly Schedule Mr. Lee's Execution Is Not Arbitrary and Capricious .......................................... 12

III.    THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION.................................................................................... 16

CONCLUSION................................................................................................................. 18

i

**INTRODUCTION**

Twenty years ago, Daniel Lewis Lee was convicted and sentenced to death for the "exceptionally heinous" crime of murdering all three members of an Arkansas family, including an eight-year-old girl, by shooting them with a stun gun, duct-taping plastic bags over their heads, weighing their bodies down with rocks, and drowning them in a bayou. *See Barr v. Roane*, 140 S. Ct. 353, 353 (2019) (statement of Alito, J.). Mr. Lee's conviction and sentence were affirmed on appeal, and his motions for post-conviction relief have been rejected, culminating in multiple denials of certiorari by the Supreme Court.

Mr. Lee's initial execution date of December 9, 2019, was preliminarily enjoined by the U.S. District Court for the District of Columbia in his suit challenging the Government's lethal injection protocol. Upon the Supreme Court's instruction that the court of appeals adjudicate the appeal of that preliminary injunction with "appropriate dispatch," *id.* (mem.), the D.C. Circuit vacated the injunction and the Government promptly rescheduled Mr. Lee's execution as required by regulation. He is currently scheduled to be executed on July 13, 2020.

Plaintiffs Earlene Branch Peterson, Kimma Gurel, and Monica Veillette are extended family members of Mr. Lee's victims. They are seeking to enjoin the Government from carrying out Mr. Lee's lawful death sentence on the ground that the Attorney General's decision to promptly schedule Mr. Lee's execution was arbitrary and capricious and not in accordance with law in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq*. *See* Pls' Mot. for Preliminary Inj., ECF No. 3 [hereinafter, "Pls.' Mot."].[1] Plaintiffs contend that because of their respective age and health conditions, their need to travel long distance to United States Penitentiary

---

[1] Plaintiffs initially sought to intervene in *Hartkemeyer v. Barr*, No. 2:20-cv-336-JMS-DLP (S.D. Ind.). Upon this Court's denial of their motion to intervene, they filed this instant action. Their motion for preliminary injunction nevertheless "incorporate[s] by reference and join the arguments on likelihood of success of the APA [arbitrary and capricious] claim made by Hartkemeyer." ECF No. 3 at 3; *Hartkemeyer v. Barr*, No. 2:20-cv-336-JMS-DLP, ECF No. 7. Thus, for purposes of this opposition brief, the Government will refer to the APA arguments made by Rev. Hartkemeyer as though they are presented by Plaintiffs here.

at Terre Haute, Indiana ("U.S.P. Terre Haute"), where the execution will take place, and the number of people that are expected to be present at the execution, they would each be subject to an unacceptably high risk of exposure to COVID-19 if they proceed with their current plan to attend Mr. Lee's execution.

Plaintiffs' APA claims lack merit. The Attorney General's decision to promptly schedule Mr. Lee's execution was an agency action committed to agency discretion by law, and is therefore unreviewable under the APA. *See* 5 U.S.C. § 701(a)(2). Further, Plaintiffs are not within the "zone of interests" protected by any relevant law or regulation. *See Am. Fed'n of Gov't Empls., Local 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir. 1999). Although the government endeavors to facilitate attendance by victims' family members who wish to attend a scheduled execution, no permissible witness has a statutory entitlement to attend the execution. Nor does the Department of Justice ("DOJ") regulation requiring the Warden to select witnesses—and allow their presence—grant them such entitlement. *See* 28 C.F.R. § 26.4. The DOJ regulation serves the purpose of carrying out the Government's solemn duty of meting out the ultimate punishment in a dignified manner. The fact that Plaintiffs are victims of Lee's crime means that the government has made efforts to accommodate their attendance, but in terms of legally enforceable rights vis-à-vis Lee's capital sentence, they stand in the shoes of any member of the public.

Even assuming Plaintiffs could surpass these threshold obstacles, their APA claim is still unlikely to succeed because the Attorney General's decision was not arbitrary and capricious. Aside from the compelling governmental interest in the timely enforcement of capital punishment, DOJ regulations mandate that the BOP Director schedule executions promptly after the lifting of the stay of a previously scheduled execution. 28 C.F.R. § 26.3(a). At the same time, the Federal Bureau of Prisons ("BOP") is of course acutely aware of the risks posed by the COVID-19 pandemic. As with the rest of the country, the Government must cope with the challenges posed by the pandemic by taking mitigation measures, which is what it is planning to do for Lee's execution. As demonstrated by the declaration of Rick Winter, BOP has taken appropriate measures to mitigate those risks while still performing its important duties. Indeed, BOP is

prepared to take an extensive array of precautions to mitigate the risk to Plaintiffs' health should they opt to attend, including giving them the opportunity to utilize Personal Protective Equipment ("PPE") in the form of a surgical face mask, gloves, a gown, and a plastic face shield, on the day of the execution; and limiting their interaction with BOP staff and restricting their interaction with other witnesses, inmates, media, and the public. *See Hartkemeyer v. Barr*, No. 2:20-cv-00336-JMS-DLP, ECF No. 51-1, Declaration of Rick Winter (July 8, 2020), ¶¶ 7-13 [hereinafter "Winter July 8 Decl."].  The Government plainly did not commit a clear error in judgment in scheduling Mr. Lee's execution, and under the APA's highly deferential standard of review, Plaintiffs cannot substitute their own preference for the execution schedule for that of the Attorney General on a matter such as this.

Plaintiffs' argument that the execution schedule is not "in accordance with law" is likewise incorrect.  Although Plaintiffs were selected as witnesses to Mr. Lee's execution pursuant to 28 C.F.R. § 26.4, that regulation gives the Warden discretion to select witnesses; it does not create any legally cognizable right or interest for the witnesses whom the Warden selects, and it does not dictate that BOP must schedule executions based on those witnesses' availability.  Rather, the relevant regulations governing BOP's setting of execution dates requires that a new execution date should be "designated promptly" if the initial date was postponed, 28 C.F.R. § 26.3(a)(1), which is precisely what happened here.   Accordingly, Plaintiffs have no likelihood of success on their APA claims.

Finally, the balance of harms also tips against the issuance of a preliminary injunction in light of the Government's interest and the public's interest in the timely execution of Lee given his heinous crimes.  Accordingly, this Court should deny Plaintiffs' motion.

## BACKGROUND

### I.   PROCEDURAL HISTORY

In 1999, Lee was convicted by a jury of his peers of conspiring to violate and violating the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. § 1962(c) and (d), and of three

murders in aid of racketeering in violation of 18 U.S.C. § 1959. *United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004). Lee, his codefendant, and others had formed a white supremacist organization, and, in pursuit of the organization's criminal goals, he and his co-defendant robbed and then murdered all three members of an Arkansas family, including an eight-year old child. Lee and his co-defendant shot their victims, placed plastic bags over the victims' heads, sealed the bags with tape, and then threw the bodies laden down with rocks into the Illinois bayou. *Id.* at 641–42. The same jury that convicted Lee returned a death verdict against him on May 14, 1999. *Id.* at 643.

Lee's conviction was affirmed on appeal, *id.* at 641, and his petition for certiorari was denied, 545 U.S. 1141 (2005). He then unsuccessfully sought post-conviction relief pursuant to 28 U.S.C. § 2255. *See United States v. Lee*, No. 4:97-CR-00243-(2), 2008 WL 4079315, at *1 (E.D. Ark. Aug. 28, 2008), *aff'd*, 715 F.3d 215 (8th Cir. 2013), *rehearing denied*, 811 F.3d 272 (8th Cir. 2015), *cert. denied*, 135 S. Ct. 72 (2014). He also unsuccessfully moved to reopen the § 2255 proceeding pursuant to Fed. R. Civ. P. 60(b) and exhausted all appeals as to that motion. *See United States v. Lee*, No. 4:97CR00243-02, 2014 WL 1093197, at *1 (E.D. Ark. Mar. 18, 2014), *aff'd*, 792 F.3d 1021 (8th Cir. 2015), *rehearing denied*, 811 F.3d 272 (8th Cir. 2015), *cert denied*, 137 S. Ct. 1577 (2017).

In 2011, while Mr. Lee litigated his post-conviction remedies, DOJ announced that BOP did not have the drugs necessary to implement its lethal injection protocol, which at the time called for the use of three drugs. In separate litigation challenging that protocol, BOP also disclosed that it had decided to modify its lethal injection protocol as a result of the drug scarcity. *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 12-CV-0782, 2019 WL 6691814, at *2 (D.D.C. Nov. 20, 2019), *vacated by*, 955 F.3d 106 (D.C. Cir. 2020) [hereinafter "*Execution Protocol Cases*"]. In fact, the scarcity of lethal injection drugs as a result of public pressure by anti-death penalty advocates was a widespread problem for the next several years. *See generally Glossip v. Gross*, 135 S. Ct. 2726, 2733-34 (2015) (recounting the history of the problem); *cf. Gray v. McAuliffe*, No. 3:16CV982, 2017 WL 102970, at *7 (E.D. Va. Jan. 10, 2017) ("In light of the

4

pressure waged by death penalty opponents, it has become increasingly difficult to obtain the drugs Virginia traditionally used to render a prisoner unconscious during the initial stage of the execution process."). Meanwhile, BOP engaged in an "extensive study" of its options: it "explored the possible use of other lethal substances[,] . . . visited state execution sites and evaluated their protocols[,] . . . consulted with medical experts, reviewed assessments of difficult executions, and studied relevant judicial decisions." *Execution Protocol Cases*, 955 F.3d at 110 (per curiam). It also considered "three-drug protocols using . . . barbiturates, three-drug protocols using weaker sedatives, and one-drug protocols." *Id.*

On July 25, 2019, at the direction of the Attorney General, BOP adopted a revised addendum to its lethal injection protocol that replaced the three-drug procedure with the use of a single drug, pentobarbital sodium, as the lethal agent. *Id.* In announcing this change, DOJ also established execution dates for five condemned federal inmates, including Mr. Lee. *Id.* at 111. Mr. Lee's execution was set for December 9, 2019.[2] Mr. Lee filed suit challenging BOP's single-drug protocol and on November 20, 2019, succeeded in obtaining a preliminary injunction staying his execution. *Id.* On April 7, 2020, the D.C. Circuit vacated the district court's injunction, *id.* at 108, but the mandate did not issue until June 12, 2020. On June 15, 2020, the Attorney General directed BOP to schedule the executions of four federal death-row inmates, including Mr. Lee. Mr. Lee's execution date was set for July 13, 2020.[3]

## II.   BOP'S EXECUTION PREPARATIONS

Shortly after the announcement of Mr. Lee's July 13, 2020 execution date, BOP informed Plaintiffs of the execution date in order to begin their travel arrangements. Winter July 8 Decl.

---

[2] *See* Press Release, Dep't of Justice, "Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse" (July 25, 2019), https://www.justice.gov/opa/pr/federal-governmentresume-capital-punishment-after-nearly-two-decade-lapse.

[3] *See* Press Release, Dep't of Justice, "Executions Scheduled for Four Federal Inmates Convicted of Murdering Children" (June 15, 2020), https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children.

¶ 5.  According to their Complaint, Plaintiffs Veillette and Gurel must travel by air and then by car to reach USP Terre Haute, and Plaintiff Peterson must be driven to USP Terre Haute by car by her son.  Compl. ¶ 72.  While the Government obviously has no control over the logistics of Plaintiffs' travel to USP Terre Haute, BOP has put in place numerous mitigation measures to minimize the health risk to Plaintiffs upon their arrival at Federal Correction Complex Terre Haute ("FCC Terre Haute") [4] should they decide to attend Mr. Lee's execution.

Specifically, Plaintiffs will be picked up by BOP staff from a designated location off FCC Terre Haute grounds.  Winter July 8 Decl. ¶ 11.  Upon being picked up, they will be given the opportunity to utilize Personal Protective Equipment ("PPE") in the form of a surgical face mask, gloves, a gown, and a plastic face shield.  *Id.*  BOP staff will be wearing face masks.  *Id.*  Passengers in the vehicle will include Plaintiffs and members of their immediate family.  *Id.*  Plaintiffs will be escorted to FCC Terre Haute and through security to a staging area on FCC Terre Haute property.  *Id.*  At the staging area, they will have access to hand sanitizer and a restroom with a sink and hand soap.  *Id.*  The individuals at the staging area will include Plaintiffs, their immediate family members, three other witnesses from the family of Lee's victims and approximately four BOP staff members.  *Id.*  The staging area allows for ample social distancing.

At the appropriate time, Ms. Veillette, the only one of the three plaintiffs to have chosen to witness the execution, will be escorted to the execution facility witness room.  Winter July 8 Decl. ¶ 12.  She will be accompanied in the witness room by two additional witnesses, who will have access to PPE, and a small number of BOP staff, who will be wearing face masks.  *Id.*  Hand sanitizer will be available and the witnesses will have access to a sink with hand soap.  *Id.*  Ms. Peterson and Ms. Gurel have elected to remain in the staging area during the execution.  *Id.*  At the conclusion of the execution, Plaintiff Veillette and the other witnesses in the execution facility

---

[4] The Terre Haute Federal Correction Complex ("FCC Terre Haute") consists of USP Terre Haute, as well as a Federal Correctional Institution ("FCI Terre Haute") and a prison camp. Winter Decl. ¶ 8.

witness room will be escorted back to the staging area.  The rest of their group will then be picked up and escorted back to the designated area where they were initially picked up.  *Id.* ¶ 13.

As these measures demonstrate, throughout their visit to FCC Terre Haute, Plaintiffs will have no interaction with any inmates or members of the public other than possible limited interaction with the rest of the witness group comprised of only the family members of Mr. Lee's victims.  Winter July 8 Decl. ¶ 10.  As to their interaction with BOP employees, while the execution team consists of approximately 40 BOP staff members, the vast majority of them have assignments in areas other than where Plaintiffs will be located.  *Id.*  Similarly, while approximately 100 BOP staff members and approximately 50 members of specialized teams will have various roles in the overall security of FCC Terre Haute, the vast majority will have duties which will not cause them to have any interaction with Plaintiffs.  Winter Decl. ¶ 10.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).  It is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  To obtain a preliminary injunction, "a plaintiff must establish that [he] has some likelihood of success on the merits; that [he] has no adequate remedy at law; that without relief [he] will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citation and quotation marks omitted). "If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction." *Id*. (citation and quotation marks omitted); *accord Lankford v. Talbot*, No. 1:18-cv-03935-JMS-TAB, 2020 WL 2128580 (S.D. Ind. May 5, 2020) (Magnus-Stinson, J.) (quoting same).  Only after a plaintiff passes this threshold must a court "weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest."  *GEFT Outdoors*, 922 F.3d at 364 (citation and quotation marks omitted).

7

The Seventh Circuit "'employs a sliding scale approach' for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *Id*. (citation and quotation marks omitted). However, if a plaintiff cannot show a likelihood of success on the merits of his claim, "there [is] no need for the district court to conduct further analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase.'" *Id*. at 367-68 (citing *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018)); *see also Glossip*, 135 S. Ct. at 2737; *see also Hill*, 547 U.S. at 584 ("[I]nmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of *a significant possibility of success on the merits*.") (emphasis added). And a plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is *likely*," not merely possible, "in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). As discussed below, Plaintiffs have failed to make the requisite showing.

## ARGUMENT

## I.  PLAINTIFFS ARE UNLIKELY TO SUCCEED IN SHOWING THAT BOP'S PROMPT SCHEDULING OF MR. LEE'S EXECUTION VIOLATES THE APA

Plaintiffs challenge BOP's decision to promptly schedule Mr. Lee's execution as arbitrary and capricious in violation of the APA. But judicial review is not available under the APA here, and even if it were, Plaintiffs do not even arguably fall within the zone of interests of any relevant law to challenge an execution date. And in any event, the Attorney General's decision is not arbitrary or capricious, nor is it "not in accordance with law."

### A.  The Decision as to When To Schedule An Execution Is Committed to Agency Discretion By Law

The APA excludes from its "basic presumption of judicial review," *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993), agency actions that are "committed to agency discretion by law." 5 U.S.C.

8

§ 701(a)(2).[5] The Supreme Court has explained that if a statute provides no "judicially manageable standards" to judge "how and when an agency should exercise its discretion," it is impossible for a court to determine whether that agency "abuse[d] [its] discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Review under the APA is thus unavailable when "'statutes are drawn in such broad terms that in a given case there is no law to apply,'" *id.* (quoting S. Rep. No. 79-752, at 26 (1945)), or "no meaningful standard against which to judge the agency's exercise of discretion," *id.* The decision as to when to set execution dates for death row inmates who have exhausted their appellate and post-conviction process is just such an exercise of discretion.

"When deciding whether a decision is committed to agency discretion, [the court] first review[s] the applicable statutes and regulations." *Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1072 (7th Cir. 2020), *reh'g denied* (May 8, 2020). Here, the Federal Death Penalty Act ("FDPA") entrusts the Attorney General with discretion concerning when to carry out a lawful sentence of death once the appellate and post-conviction process is complete. As relevant here, it provides that after "exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence," and "when the sentence is to be implemented," the Attorney General shall release the inmate to a United States Marshal, who shall supervise implementation of the sentence. 18 U.S.C. § 3596(a). DOJ regulation further provides that unless a court orders otherwise, a sentence of death shall be executed on a date designated by the Director of BOP that is "no sooner than 60 days from the entry of the judgment of death." 28 C.F.R. § 26.3(a)(1). The only other limitations on the choice of the execution date are either designed to afford notice to the inmate— *i.e.* that the inmate generally will be given 20 days' notice, *id.* § 26.4(a)—or to ensure that a new execution date is "designated promptly" if the initial date was postponed, *id.* § 26.3(a)(1).

---

[5] Plaintiffs incorrectly assert that the opposite is true. Hartkemeyer Pl.'s Mot. (ECF No. 7) at 25 ("The APA applies to 'agency action [that] is committed to agency discretion by law.' 5 U.S.C. § 701(a)(2)."). That section of the APA in fact says: "This chapter applies, according to the provisions thereof, *except to the extent that . . .* agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (emphasis added).

9

Indeed, the Executive Branch (along with the Judiciary) has long possessed the authority to schedule execution dates in federal death penalty cases, and the Federal Death Penalty Act of 1994 confirms the Executive Branch's central role in implementing federal death sentences. Moreover, the Executive Branch is constitutionally obligated to see "that the laws be faithfully executed." U.S. Const. art. II, § 3. And Congress has authorized the Attorney General to "prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business," 5 U.S.C. § 301; has vested all functions of the Department of Justice in the Attorney General; and has authorized officers, employees, and agencies of the Department to perform those functions, 28 U.S.C. §§ 509, 510.   Among the agencies within the Department of Justice are the United States Marshals, whose obligation is to "obey, execute, and enforce all orders of the United States District Courts," 28 U.S.C. § 566(a), and to "execute all lawful writs, process, and orders issued under the authority of the United States," 28 U.S.C. § 566(c). Also among the agencies within the Department of Justice is BOP, which is charged with determining the place and manner of custody of prisoners, *see* 18 U.S.C. § 3621. These provisions, together with the implementation provisions in the Federal Death Penalty Act, reinforce the Executive Branch's longstanding authority to set federal execution dates.

Thus, once the inmate has exhausted the procedures for appeal of the judgment of conviction and for review of the sentence and the minimum timing requirements are met, no source of law establishes any standard against which to review the Attorney General's choice of an execution date.   Indeed, the decision regarding when to carry out a lawful sentence of death is a quintessential law enforcement decision that is presumed to be unreviewable.  It is also no different than any other BOP decisions that may impact inmates subject to them, yet are nevertheless committed to agency discretion by law.  *See, e.g.*, *Harris v. United States*, No. 2:13-CV-214, 2013 WL 3724861, at *2 (S.D. Ind. July 15, 2013) (holding unreviewable, as committed to agency discretion by law, the decision to place prisoner in special housing unit).  There are no legal norms by which this Court may "evaluate the challenged action, and [ ] no concrete limitations to impose

10

on the agency's exercise of discretion." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Plaintiffs have not demonstrated otherwise. On the contrary, they agree that "the authority to schedule executions is delegated to the Attorney General by statute." Hartkemeyer Pl.'s Mot. at 26. Accordingly, the Attorney General's decision to promptly schedule Mr. Lee's execution is unreviewable.

**B.      Plaintiffs Are Outside the Zone of Interests Protected By Any Applicable Law**

Even if the agency action of scheduling Mr. Lee's execution were reviewable under the APA, that still does not mean that Plaintiffs could challenge it. To entitle them to judicial review under the APA, Plaintiffs must establish that they are "aggrieved by agency action . . . within the meaning of a relevant statute." 5 U.S.C. § 702. To qualify for such review, Plaintiffs' claim must at least be "arguably within the zone of interests" that Congress sought to protect or regulate under the statute in question. *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970). As the Supreme Court has explained, the zone of interests test "serve[s] to limit the role of the courts in resolving public disputes," by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also Air Courier Conference of Am. v. Postal Workers*, 498 U.S. 517, 523–524 (1991) (a plaintiff must "establish that the injury he complains of . . . [is] protected by the statutory provision whose violation forms the legal basis for his Complaint"). Specifically, the court uses "traditional tools of statutory interpretation" to determine whether "a legislatively conferred cause of action encompasses a particular plaintiff's claim" or whether the plaintiff "has a cause of action under the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 (2014).[6]

Here, the FDPA, which authorizes the Attorney General to carry out the sentence of death, makes no provision for witnesses such as Plaintiffs to attend an execution, much less provides

---

[6] Although previously analyzed as a "prudential standing" question, the Supreme Court has clarified that "zone of interests" is more appropriately considered a question of whether the plaintiff has adequately pled a claim. *See Lexmark*, 572 U.S. at 127-28.

them a private cause of action to protect *their* rights. *See* 18 U.S.C. § 3596. Although Plaintiffs place central reliance on 28 C.F.R. § 26.4(c)—which provides that certain witnesses selected by the Warden "shall be present" at the execution, as discussed below, that regulation creates no legally cognizable rights, is instead designed to ensure that the Government carries out the ultimate punishment of death in a public and dignified manner, and by no means requires BOP to schedule executions based on the witnesses' availability. Were it otherwise, any witness—including the inmate's defense attorneys and friends and relatives, 28 C.F.R. § 26.4(c)(ii)—who could not attend an execution due to a scheduling conflict would be entitled to judicial review under the APA. That is not a reasonable reading of the regulation.

In sum, because Plaintiffs do not arguably fall within the zone of interests of any relevant statute or regulation, their APA claim is unlikely to succeed on this basis as well.

## C. The Attorney General's Decision to Promptly Schedule Mr. Lee's Execution Is Not Arbitrary and Capricious

Plaintiffs mistakenly argue that the Attorney General's decision to schedule Mr. Lee's execution on July 13, 2020 is arbitrary and capricious. The scope of review under the "arbitrary and capricious" standard is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Under this highly deferential standard, an administrative decision should be upheld as long as the agency's path may be reasonably discerned." *Sierra Club v. U.S. EPA*, 774 F.3d 383, 393 (7th Cir. 2014) (internal quotation marks omitted). "A court is not to ask whether [an agency's] decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Rather, the court's task is to ensure that the agency remained "within the bounds of reasoned decisionmaking" and that there has been no "clear error in judgment." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

Under this standard, it is evident that Plaintiffs are unlikely to succeed in showing that the Attorney General made a clear error in judgment. Much of what Plaintiffs take issue with comes

12

down to the fact that the Attorney General did not, in announcing the execution date, also explain why he decided to do so during the COVID-19 pandemic (rather than indefinitely postponing it) and what protections would be afforded participants attending the execution. Hartkemeyer Pl.'s Mot. at 31. Of course, nothing requires that the decision on the execution date be made on the record, with a full explanation publicly provided. *See* 18 U.S.C. § 3596; 5 U.S.C. § 554(a); *see also Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, No. 19-431 at 24 (U.S. Jul. 8, 2020) (courts cannot add new procedural requirements that are not already mandated by the APA—"we have repeatedly rejected courts' attempts to impose 'judge-made procedur[es]' in addition to the APA's mandates" (quoting *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 102 (2015)).

The Attorney General's reasons for setting the execution date expeditiously are self-evident. BOP initially scheduled Mr. Lee's execution for December 9, 2019, the announcement of which was made on July 25, 2019, upon BOP's adoption of a new lethal injection protocol.[7] The execution date was preliminarily enjoined by the U.S. District Court for the District of Columbia in litigation challenging the lethal injection protocol, and although both the D.C. Circuit and the Supreme Court denied the Government's stay applications or vacatur of the preliminary injunction, the Supreme Court noted its "expect[ation] that the Court of Appeals will render its decision with *appropriate dispatch*." *Barr v. Roane*, 145 S. Ct. 353 (2019) (mem.) (emphasis added). Throughout the preliminary injunction litigation, the Government repeatedly emphasized the Supreme Court's recognition that the government has "an important interest in the timely enforcement of a death sentence." *See e.g.*, *Bucklew*, 139 S. Ct. at 1133 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)); Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. at 45, ECF No. 16, *In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (D.D.C. Oct. 18, 2019). As the Supreme Court has also said, once post-conviction proceedings "have run their course … finality acquires an added moral dimension." *Calderon v. Thompson*, 523 U.S. 538, 556

---

[7] *See* DOJ Press Release No. 19-807, *available at* https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-decade-lapse.

(1998). "Only with an assurance of real finality can the [government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Id.* As the Government also repeatedly argued, unduly delaying executions can frustrate the death penalty by undermining its retributive and deterrent functions. *See Bucklew*, 139 S. Ct. at 1134; *id.* at 1144 (Breyer, J., dissenting). When the D.C. Circuit vacated the preliminary injunction and the Supreme Court denied Mr. Lee's and other inmates' request to stay the issuance of the mandate by the D.C. Circuit, the Government promptly rescheduled the long-delayed executions, as required by regulation, 28 C.F.R. § 26.3(a)(1) ("[A] new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted."). Rather than being arbitrary and capricious, that action reflects the Government's consistent position that a lawful sentence of death should be carried out promptly.

Plaintiffs' primary argument is that BOP failed to consider "the clear 'less restrictive, yet easily administered' alternative of waiting to schedule the execution at a time when the immediate threat of the pandemic has passed," Hartkemeyer Pl.'s Mot. at 31, and they ask that the execution be postponed "until there is an effective COVID-19 treatment or vaccine." *Id.* at 24. But such an indefinite delay is contrary to the Government's compelling interest in promptly carrying out Mr. Lee's death sentence. A "less restrictive, yet easily administered" alternative that a court may require an agency to have considered must nevertheless allow the agency to accomplish its "objective." *See Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 761 (6th Cir. 1995).

There is also no basis for Plaintiffs to speculate that BOP acted at random. *United States v. Chem. Found., Inc.*, 272 U. S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties"). As part of selecting the date in June 2020, BOP of course has considered COVID-19 and its effects on the individuals involved. Indeed, Plaintiffs themselves cite multiple BOP COVID-19 response plans predating the date selection that have evolved over time, including actions that BOP has taken to prevent the spread of COVID-19. Hartkemeyer Pl.'s Mot. at 5-6. The attached declaration of Rick Winter also details

14

the measures that will be taken to mitigate Plaintiffs' potential exposure to COVID-19.  Winter July 8 Decl. ¶¶ 7-13.  Thus, there is no basis to find that BOP "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.  While Plaintiffs may have weighed the importance of a speedy execution against the possible effects of COVID-19 differently and come to a difference conclusion, they may not substitute their judgment for that of BOP.  *See id.* Nor should this Court do so.

Finally, Plaintiffs attempt to bolster their claim by relying on the purported risk of COVID-19 infection to "all of the people who participate in or witness the execution."  Hartkemeyer Pl.'s Mot. at 31.  To the extent Plaintiffs attempt to assert other people's interests, they have no standing to do so because they have demonstrated no close relationship with those other participants, and those individuals do not have any impediment to bringing their own claims.  *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (holding that to have third-party standing, the litigant must have a close relation to the third party and there must exist some hindrance to the third party's ability to protect his or her own interest).  And as to the risk of spread of COVID-19 to Plaintiffs, BOP has specifically considered that issue now, *see* Winter July 8 Decl.  ¶¶ 7-13, and concluded that it can and will take sufficient measures to mitigate that risk.  Accordingly, Plaintiffs are unlikely to succeed on their claim that the setting of the execution date was arbitrary and capricious.

> **D.      The Attorney General's Decision to Promptly Schedule Mr. Lee's Execution Is Squarely in Accordance With Law**

Plaintiffs' alternative APA claim also lacks merit.  They argue that the scheduling of Mr. Lee's execution is not in accordance with law in violation of the APA because, in Plaintiffs' view, a DOJ regulation gives them a right to attend Mr. Lee's execution.  *See* Mot., ECF No. 3 at 3 (citing 28 C.F.R. § 26.4).  That regulation, which allows the Warden to select "[e]ight citizens" who "shall be present" at the execution, creates no legally enforceable rights.  Rather, it gives the Warden discretion to select witnesses to attend executions, and once selected, such witnesses shall be permitted to be present.  *See Entertainment Network, Inc. v. Lappin*, 134 F. Supp. 2d 1002, 1007 (S.D. Ind. 2001) (noting that 28 C.F.R. § 26.4 "specif[ies] who shall be *permitted* to attend

15

federal executions") (emphasis added).  Indeed, any other reading would lead to the absurd result that any witness to a federal execution could dictate the scheduling of execution on that witness's personal availability.  Plaintiffs cite no support for such extraordinary bystander rights.

Setting aside that incorrect reading of § 26.4(c), the Attorney General clearly acted in accordance with the controlling regulation, C.F.R. § 26.4(a), which requires that new execution dates be "designated promptly" if the initial date was postponed.  That is precisely what happened here.  Mr. Lee's initial execution date of December 9, 2019 was first postponed when it was preliminarily enjoined by the U.S. District Court for the District of Columbia in his suit challenging the Government's lethal injection protocol.  Upon the Supreme Court's instruction that the court of appeals adjudicate the appeal of that preliminary injunction with "appropriate dispatch," *id.* (mem.), the D.C. Circuit vacated the injunction, and, in accordance with 28 C.F.R. § 26.4(a)(1), the Government promptly rescheduled Mr. Lee's execution as it was required to do.  Thus, the prompt scheduling of Mr. Lee's execution for July 13, 2020 was indeed in accordance with law. Plaintiffs' alternative APA claim is therefore unlikely to succeed on the merits.

## III.   THE BALANCE OF HARMS WEIGHS AGAINST ENTRY OF A PRELIMINARY INJUNCTION

Because Plaintiffs have failed to establish a likelihood of success on the merits, the Court need not proceed further to consider the remaining threshold preliminary injunction factors: irreparable injury and no other adequate remedy at law.  *See GEFT Outdoors, LLC*, 922 F.3d at 367-68 (noting that if a plaintiff cannot show a likelihood of success on the merits of his claim, "there [is] no need for the district court to conduct further analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase'"); *accord Lankford*, 2020 WL 2128580 (Magnus-Stinson, J.) (quoting same).  This is consistent with the Supreme Court's application of the preliminary injunction standard in Eighth Amendment method-of-execution challenges, where an inmate's failure to establish a likelihood of success alone warrants denial of the inmate's motion to preliminarily enjoin his execution. *See Glossip*, 135 S. Ct. at 2737.  Because

16

Plaintiffs have shown no likelihood of success on the merits of their claims, the Court should deny their motion for a preliminary injunction.

Should the Court proceed further, though, the balance of equities tip against issuing an injunction. First, the mere "possibility" that Plaintiffs will be exposed to COVID-19 if they attend the execution is insufficient to establish irreparable harm, because a plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Given the precautions BOP has taken and will take as described above, it cannot be said that Plaintiffs are likely to contract COVID-19 in the absence of an injunction. Furthermore, Plaintiffs cannot dispute the Government's overwhelming interest in the timely enforcement of criminal sentences imposed by unanimous federal juries after fair trials and upheld through extensive appellate and post-conviction proceedings in federal courts. *See Bucklew*, 139 S. Ct. at 1123. The American people have chosen to make capital punishment available in the federal system. If that decision is to be given meaningful effect, sentences must be enforced in cases like this. Although Plaintiffs argue that "there is no harm to delaying Mr. [Lee's] execution until a time when the pandemic's risk have ebbed," Hartkemeyer Pl.'s Mot. at 33, as discussed above such an indefinite delay is inconsistent with the Supreme Court's teaching that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence," *Bucklew*, 139 S. Ct. at 1133 (quoting *Hill*, 547 U.S. at 584); *see also Calderon*, 523 U.S. at 556 (explaining that once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension"). "Only with an assurance of real finality can the [Government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon*, 523 U.S. at 556. *See Bucklew*, 139 S. Ct. at 1134; *id*. at 1144 (Breyer, J., dissenting). Although Plaintiff Peterson has publicly opposed Mr. Lee's death penalty, *see* NY Times, *She Doesn't Want Her Daughter's Killer To Be Put To Death. Should the Government Listen? available at* https://www.nytimes.com/2019/10/29/us/arkansas-federal-death-penalty.html?smid=em-share (last accessed July 9, 2020), she is not the lone family member of a victim of Mr. Lee's crimes—

17

and the public at large has an interest independent in carrying out the lawful sentence imposed on Lee for his heinous crimes against a vulnerable member of society. Finally, unduly delaying executions can also frustrate the death penalty by undermining its retributive and deterrent functions.

Finally, the Government's interest in implementing Mr. Lee's sentence is "magnified by the heinous nature" of his offense. *Execution Protocol Cases*, 955 F.3d at 127 (Katsas, J., concurring) (discussing Mr. Lee's crimes). Mr. Lee brutally murdered all three members of an Arkansas family, including an eight-year-old girl, by shooting them with a stun gun, duct-taping plastic bags over their heads, weighing their bodies down with rocks, and drowning them in a bayou. This sentence has been upheld throughout Mr. Lee's many years of direct and post-conviction review. Plaintiffs' contention that their interest in rescheduling Mr. Lee's execution outweighs the Government's interest in finally implementing the lawful capital sentence Mr. Lee incurred finds no support in equity.

For all these reasons, the balance of equities tips against granting a preliminary injunction.

### CONCLUSION

For the foregoing reasons, this Court should deny the motion for a preliminary injunction.

JOSH J. MINKLER
United States Attorney

By:     *s/ Shelese Woods*_____
Shelese Woods
Assistant United States Attorney

### CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2020, the foregoing was filed electronically through ECF/CM. On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.

s/ *Shelese Woods*

18

Shelese Woods
Assistant United States Attorney
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN 46204
(317) 226-6333
(317) 226-6125 [Fax]

19